SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| STEVEN R. PERLES,<br>PERLES LAW FIRM, P.C.,<br>and<br>FAY AND PERLES FSIA<br>LITIGATION PARTNERSHIP,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH PETER DRENNAN<br>DAN GASKILL,<br>and<br>PATRICK DONAHUE,<br><br>Defendants | **SUMMONS**<br>Index No.:<br><br>The basis of venue is:<br>Plaintiffs' designation<br><br>Plaintiff designates<br>NEW YORK COUNTY as place of trial |

**TO THE ABOVE-MENTIONED DEFENDANT:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this Summons, to serve a notice of appearance on the Plaintiff's Attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED: New York, NY
July 8, 2019

LAW OFFICES OF STEPHEN TURANO

By:_____ss//Stephen Turano_____
275 Madison Avenue
New York, NY 10016
(917) 974-1781 (tel)
(212) 208-2981 (fax)

*Counsel for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| STEVEN R. PERLES,<br>PERLES LAW FIRM, P.C.,<br>and<br>FAY AND PERLES FSIA<br>LITIGATION PARTNERSHIP,<br><br>              Plaintiffs,<br><br>        v.<br><br>JOSEPH PETER DRENNAN<br>DAN GASKILL,<br>and<br>PATRICK DONAHUE,<br><br>            Defendants | **VERIFIED COMPLAINT**<br><br><br>Index No.: |

## VERIFIED COMPLAINT

Plaintiffs, Steven R. Perles, Perles Law Firm, P.C.. and "Fay and Perles FSIA Litigation Partnership" (collectively, "Plaintiffs"), by and through their counsel, Stephen Turano, Esq., as and for their Complaint in this action against Defendants, Joseph Peter Drennan, Dan Gaskill and Patrick Donahue ("Defendants"), hereby allege the following:

I.   NATURE OF THE CLAIMS

1.     This action arises out of Plaintiffs' successful efforts to bring Iran to judgment for its shameful sponsorship of a terrorist bombing that killed and wounded hundreds of U.S. service personnel in Lebanon in 1983, and Defendants' failure to contribute in any way to the massive collection effort that followed, despite knowing that it would benefit their clients. Most of that collections work took place in the State of New York.

Case 1:19-cv-10690   Document 1-1   Filed 11/19/19   Page 3 of 55

2.       Before Defendants ever were involved, Plaintiffs undertook the risk and expense of spearheading an international investigation that literally uncovered the evidence of Iran's involvement in the "Marine Barracks Bombing" in Beirut in October of 1983, one of the most infamous terror attacks upon America before 9/11. After uncovering that evidence, Plaintiffs successfully litigated the matter to judgment in 2007 in Washington, DC on behalf of 811 plaintiffs who had been injured in the attack or whose family members had been injured or killed there. The bombing plaintiffs were awarded approximately $2.6 billion. Defendants subsequently obtained judgments against Iran on behalf of additional bombing plaintiffs in the same court by filing cookie-cutter pleadings on their behalf and asking the court to take judicial notice of the judgment that Plaintiffs had won.

3.       In June of 2008—one year after Plaintiffs' clients were awarded their judgment, and two years before Defendants would obtain judgment on behalf of any of their clients—Plaintiff Perles, through a network of highly cultivated intelligence sources, learned of the presence in New York City of an Iranian asset valued at approximately $2.1 billion. The asset consisted of cash and U.S. denominated securities that was passed through the Clearstream entity and was held at Citibank, N.A., located in New York City. That discovery commenced an 8+ year collections effort centered in large part on this State, and which involved, among other things, retaining New York counsel, freezing the asset at Citibank, and litigating its turnover in the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit. It also involved the literal passage of federal legislation to facilitate turnover of the asset—again possible only because of Plaintiff Perles's extensive connections—and successful litigation of the turnover through the Supreme Court of the United States, relying largely on that legislation. The result was the creation, on July 9, 2013, of a Qualified Settlement Fund ("QSF") "created and accepted by the Fund Trustee in the State of New York," the "rights

created" under which "shall be governed by the laws of the State of New York." *Deborah D. Peterson*, et al*., v. Isalmic Republic of Iran*, et al., No. 1:10-cv-4518-KBF, ECF No. 461 at 12 (S.D.N.Y. July 9, 2013).  The QSF is "custodied at UBS Wealth Management (Americas) Inc. UBS Global Asset Management (Americas) Inc.," *id.* at 4, which, upon information and belief, is located at 1285 Avenue of the Americas, New York, NY. Distributions from the QSF began in 2016.

4.     Despite standing to personally receive—and in fact receiving—millions of dollars in their pockets from the collection achieved by Plaintiffs; and despite the fact that their plaintiffs promised, through Defendants, to "commit[] to participate to the extent possible" in the collection effort, Defendants failed to contribute a single minute of work or a single dollar of costs to that incredible collection effort.  Defendants furthermore stand to receive more from future collections that Plaintiffs, with no help from Defendants, continue to pursue to satisfy the judgments that the bombing victims have won.

5.     Plaintiffs bring this action in order to correct that injustice.  Plaintiffs bring claims for unjust enrichment, quantum meruit, and under the doctrine of common fund, and they ask that Defendants be barred from receiving anything from any new collections in that regard beyond the 3% fee appropriate for the work that they performed, as explained below.

II.     <u>PARTIES</u>

6.     Plaintiff Steven R. Perles is an attorney with his principal place of business in Washington, D.C.  He is a resident of the State of Florida.

7.     Plaintiff Perles Law Firm, P.C., is Mr. Perles's law firm, located at 1050 Connecticut Ave., NW, Washington, DC 20036.

8.      Plaintiff Fay and Perles FSIA Litigation Partnership is a general partnership formed under the laws of, and with its principal place of business in, the District of Columbia.

9.      Defendant Joseph Peter Drennan is an attorney with his principal place of business in Washington, D.C.  Upon information and belief, Drennan is a resident of the Commonwealth of Virginia.

10.     Defendant Dan Gaskill is an attorney who has practiced in Washington, D.C. and Maryland.  It is unclear whether Mr. Gaskill is still actively practicing law as an attorney.  Upon information and belief, Mr. Gaskill is a resident of the State of Maryland.

11.     Defendant Patrick Donahue is an attorney whose principal place of business is in Annapolis, Maryland.  Upon information and belief, Mr. Donahue is a resident of the State of Maryland.

III.    JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over the Defendants under CPLR § 302(a)(1), because, upon information and belief, Defendants have transacted business within the State of New York in connection with their duty to collect upon judgments on behalf of their bombing victim clients.  Defendants acted as counsel for plaintiffs whose litigation proceeded in New York, and Defendants received millions of dollars in fees paid from New York under a Qualified Settlement Fund (described below) created and maintained in the United States District Court for the Southern District of New York in connection with the litigation in which Defendants participated.

13.     This Court also has personal jurisdiction over the Defendants under CPLR § 302(a)(2) because Defendants have wrongly failed to participate in the collections work that occurred and continues to occur in this State, as required by justice and by their promise to do so in the Marines Cooperation Agreement.

14.     This Court further has personal jurisdiction over the Defendants under CPLR

§ 302(a)(3)(ii) because Defendants wrongly failed to participate in collections work while

outside the state, knowing that their failure would require substantial additional effort and

outlay by Plaintiffs within State in order to compensate for their failure, and because, upon

information and belief, Defendants derive substantial revenue from interstate or

international commerce.

15.     Venue is proper in this Court because Plaintiff so designates it and none of

the parties reside in this State.  CPLR § 503.

IV.     <u>FACTUAL ALLEGATIONS</u>

16.     The claims against Defendants arise out of fees that they received in

connection with agreements known as the Marines Cooperation Agreement (entered into on

February 21, 2012) and the Litigation Cooperation and Settlement Agreement (entered into

on or about June 1, 2012).

17.     Defendants received millions of dollars in legal fees as a result of Plaintiffs'

massive collection effort, with no aid whatsoever from Defendants. Indeed, Defendants did

little of the work necessary to even obtain the judgments for any of the bombing victims in

the first place.  In order to put Plaintiffs' claims in perspective, it is necessary to begin with

the conception and initiation of the underlying litigation and the cases that followed from

that, before explaining the collection events that underlie this action.

18.     In 1983, a peacekeeping force of U.S. military personnel was stationed in

Beirut Lebanon.  The force consisted mostly of U.S. Marines but included members of

other branches of the military.  The force was in place in order ""to provide a presence in

Beirut that would in turn help establish the stability necessary for the Lebanese government

to regain control of their capital.'" [1]  The peacekeeping force operated under normal, peacetime rules of engagement.

19.    In October of 1983, the peacekeeping force was mostly lodged in a four-story, reinforced concrete building commonly referred to as the "Marine Barracks."  The building was located at the Beirut Airport.

20.    In the early morning hours of October 23, 1983, a truck that had been converted into a massive bomb smashed through the barriers of the Marine Barracks, and the bomb was detonated inside.  Judge Royce Lamberth of the United States District Court for the District of Columbia, who presided over the eventual trial of the case, described the event as follows:

> At approximately 6:25 a.m. Beirut time, the truck drove past the Marine barracks. As the truck circled in the large parking lot behind the barracks, it increased its speed. The truck crashed through a concertina wire barrier and a wall of sandbags, and entered the barracks.  When the truck reached the center of the barracks, the bomb in the truck detonated.
> The resulting explosion was the largest non-nuclear explosion that had ever been detonated on the face of the Earth. The force of its impact ripped locked doors from their doorjambs at the nearest building, which was 256 feet away. Trees located 370 feet away were shredded and completely exfoliated. At the traffic control tower of the Beirut International Airport, over half a mile away, all of the windows shattered. The support columns of the Marine barracks, which were made of reinforced concrete, were stretched, as an expert witness described, "like rubber bands." The explosion created a crater in the earth over eight feet deep. The four-story Marine barracks was reduced to fifteen feet of rubble.
> The force of the explosion was equal to between 15,000 to 21,000 pounds of TNT. FBI and ATF explosives experts both concluded that the explosive material was "bulk form" pentaerythritol tetranitrate, or PETN.

*Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 56 (D.D.C. 2003) (footnotes omitted).

---

[1]  Amended Complaint filed in *Peterson v. Iran*, 1:01-cv-02094-RCL, Document 230, September 7, 2007, pp. 23-24 (quoting General Paul X. Kelly, Commandant, United States Marine Corps).

21.     By the late 1990s, Plaintiffs had already achieved success in bringing cases on behalf of individuals injured by state-sponsored acts of terrorism, including in cases known as *Jenco*, *Flatow* and *Eisenfeld*.

22.     Following their success with those cases, Plaintiffs undertook extensive activities to collect facts to establish the culpability of The Islamic Republic of Iran and its security apparatus in the 1983 bombing of the Marine Barracks and to hold them accountable to the hundreds of people injured, directly and indirectly, by the bombing. Claimant Steven Perles deployed his significant network of information sources, including the intelligence resources of various countries, to gather the bits and pieces of evidence that eventually shone the light on Iran as the sponsor and organizer of the bombing.

23.     The investigative work included the collection of evidence regarding the construction of the truck bomb that was driven into the barracks and detonated.  It also uncovered specific facts regarding the location of where the truck bomb was assembled, the route that it took to the barracks, and the nature and extent of the explosives used.  Attorney Thomas Fortune Fay, a partner of F&P, was also materially involved in the investigation. Among other things, they engaged an operative to perform sensitive and dangerous work on the ground in the Middle East.  The operative engaged by Plaintiffs was able to "turn" a member of Hezbollah who testified as to the building of the bomb.  The operative also created a video tape showing how the bomb was constructed and the route it took to the Marine Barracks.

24.     Defendants had no role in the investigation.

25.     Mr. Perles not only uncovered the evidence of Iran's involvement, he also took the extraordinary step of successfully lobbying Congress to pass laws necessary to enable the bombing victims to obtain money judgments from Iran.  In this regard, Mr. Perles had previously labored to effectuate the passage of legislation, known as the "Flatow

Case 1:19-cv-10690  Document 1-1  Filed 11/19/19  Page 9 of 55

Amendment," that allowed suits to proceed and allowed judgments of liability and damages to be rendered against the responsible foreign agent.  Plaintiffs were able to use that statute in bringing the case against Iran.  Furthermore, Mr. Perles then separately lobbied for a law that amended the relevant statute and codified a federal cause of action in 2008 when it became clear that victims in certain states could not otherwise obtain judgments.  Finally, in 2012 Mr. Perles led an effort to create a new statute that was used in 2016 to enforce those judgments against specific Iranian assets.

26.     Without these successful legislative campaigns, no suit could have proceeded or been pursued to judgment, nor could the resultant judgments be reliably enforced. Defendants did not contribute to those groundbreaking efforts, and they would have obtained nothing at all without them.

27.      Having assembled considerable evidence establishing Iran's culpability for the bombing, and having secured the passage of legislation essential to the pursuit of a lawsuit, Plaintiffs then filed a 498-page Complaint on behalf of 811 plaintiffs: hundreds of the service personnel killed or wounded in the bombing, and hundreds more family members of deceased or wounded personnel who had claims for loss of consortium/solatium.  Defendants had no role in drafting that Complaint.

28.     The Complaint was filed in the United States District Court for the District of Columbia on October 3, 2001, where it was assigned to Judge Royce Lamberth.  The action was styled *Deborah D. Peterson, et al. v. The Islamic Republic or Iran*, et al., Civil No. 1:01-cv-02094-RCL.[2]  This was the first of the cases arising out of the bombing, and it

---

[2]  The defendants in the case were Iran and its security apparatus, The Iranian Ministry of Information and Security, or "MOIS."  For simplicity, the defendants in that case are referred to collectively as "Iran."

is generally referred to as the *Peterson* case.   A handful of similar cases, often with Defendants noted as lead counsel on the pleadings, were subsequently filed against the same defendants in connection with the same bombing, and those cases collectively are often referred to as the *Peterson* line of cases.[3]

29.     Mr. Fay and Mr. Perles took the *Peterson* case to trial on liability.  Plaintiffs presented evidence from numerous lay and expert witnesses and used the extensive factual material that they had developed during their investigation.  On May 30, 2003, the court entered a liability judgment against Iran; and the damages awards were finalized by the Court in 2007.  The *Peterson* plaintiffs had won.

30.     Judge Lamberth's liability opinion, reported at 264 F. Supp. 2d 46 (D.D.C. 2003), devoted 11 pages to a summary of the testimony and other evidence presented by Plaintiffs to establish liability, illustrating the enormous amount of work involved in obtaining that judgment.

31.     With one exception, none of the Defendants participated in any way in the trial conducted by Plaintiffs or in obtaining the liability judgment.[4]

V.     THE DAMAGES ATTORNEYS

32.     After entering the liability judgment, the Court requested damages evidence for each of the 811 *Peterson* plaintiffs.  Because there were so many plaintiffs, Plaintiffs entered into contracts with 14 other lawyers to assist them in collecting evidence of

_____

[3] The cases that were filed later are referred to collectively as the "Follow-On Cases," as described below. See paragraphs 33 *et seq*.

[4] Respondent Dan Gaskill participated in the trial to a minor extent as a salaried employee of a partnership formed by Mr. Perles and Mr. Fay. He did not act independently and was compensated for that work via his salary.

Case 1:19-cv-10690   Document 1-1   Filed 11/19/19   Page 11 of 55

damages from each plaintiff. Those contracts were entered into by Mr. Perles and Mr. Fay via F&P, which they had previously formed.[5]

33.     Those 14 lawyers, referred to as the "Damages Attorneys," were responsible for taking uncontested depositions and collecting other evidence of damages. The evidence that they collected was presented to special masters appointed by the Court for the purpose of determining appropriate dollar amounts to award to each plaintiff.

34.     On September 7, 2007, the Court awarded the *Peterson* plaintiffs a monetary judgment of $2,656,944,877.00. It included a specific award for each plaintiff. Notably, the damages awards consisted only of compensatory damages, the Court having determined that punitive damages were not available.

35.     Significantly, several of the Defendants began their involvement in the *Peterson* litigation as Damages Attorneys, as explained below.

A.   Damages Attorney Joseph Peter Drennan

36.     Respondent Joseph Peter Drennan was initially brought into the *Peterson* case as a Damages Attorney via a written contract with F&P dated June 13, 2003.

37.     Mr. Drennan agreed to develop evidence to support damages awards for specific *Peterson* plaintiffs who were listed in an exhibit to the Agreement that he executed with F&P.

38.     The Agreement specifies that, in return for his services, Mr. Drennan was to be paid "a fee consisting of the following: (1) 3% of the gross amount collected from [Iran] with respect to the compensatory damages as to each client referred to [him]; and (2) [expenses]."

---

[5] F&P was formed by Messrs. Fay and Perles in February of 2001 for the purpose of pursuing claims against foreign sponsors of terrorism.

B. <u>Damages Attorney Dan Gaskill</u>

39.     Respondent Dan Gaskill became involved in the *Peterson* litigation as a salaried employee of F&P.  As such, he was fully aware that Plaintiffs and Mr. Fay were solely responsible for the litigation arising from the barracks bombing. After (or shortly before) Mr. Gaskill left F&P, he was engaged as a Damages Attorney pursuant to an Agreement with F&P that was identical to Mr. Drennan's Agreement, except that he was assigned different plaintiffs from whom to collect damages evidence, as reflected in an exhibit to his Damages Attorney agreement.  His agreement, like Mr. Drennan's, is dated June 13, 2003.

40.     The Damages Attorney Agreement with Mr. Gaskill contains the same compensation language that appears in Mr. Drennan's: "a fee consisting of the following: (1) 3% of the gross amount collected from [Iran] with respect to the compensatory damages as to each client referred to [him]; and (2) [expenses]."

VI.     <u>THE GENESIS OF THE "FOLLOW-ON CASES"</u>

41.     Either before or during the time that the Damages Attorneys were collecting evidence, F&P became aware of other victims of the bombing who potentially had claims against Iran arising out of the bombing, some of whom were individuals who had been dismissed from *Peterson* because of vagaries in state laws.  Congress, through Mr. Perles's extraordinary efforts, amended certain statutes to codify a federal cause of action so that victims who were otherwise precluded from filing suit because of a feature of state law might nevertheless recover from Iran. Others were new individuals who approached F&P for representation.  Still others became known to the Damages Attorneys in the course of their work for F&P, when they, for example, were approached by a new relative of a deceased bombing victim while interviewing a plaintiff on behalf of F&P.

42.     The discovery of new plaintiffs continued for some time, which resulted in a series of new lawsuits being filed in the same court in Washington, DC.  These new suits are referred to as the "Follow-On Cases" because they followed the *Peterson* judgment and used its findings to achieve judgments in their own case.  The attorneys working on them are referred to as the "Follow-On Attorneys" or "**FOA**."  These follow-on cases required doing nothing more than filing cookie-cutter pleadings modeled after the *Peterson* pleadings, filing a motion asking Judge Lamberth to apply the *Peterson* liability judgment, and then doing the work of a Damages Attorney.

A.  *Valore*: The First Follow-On Case

43.     The first such "Follow-On Case" was *Valore v. Islamic Republic of Iran*, which was filed in September of 2003, four months after the liability judgment was entered and three months after the Damages Attorneys were brought into the case by F&P.

44.     Defendants Drennan and Gaskill entered their appearances in that case as counsel for the plaintiffs pursuant to discussions that Mr. Fay had with them without the knowledge or consent of Mr. Perles.  Mr. Fay appears to have asked Mr. Gaskill to assist him, and Mr. Gaskill then involved Respondent Drennan.  At the time, however, both Gaskill and Drennan had been working for F&P as Damages Attorneys pursuant to their written agreements with F&P.

45.     *Valore* also included Respondent Patrick Donahue, who became involved through Mr. Gaskill.  When Mr. Gaskill left F&P, he subsequently went to work for The Donahue Law Firm, in Annapolis, and Patrick Donahue became involved in the *Valore* case when Mr. Gaskill joined his firm and worked as a Damages Attorney.

B.  The Subsequent Follow-On Cases

46.     New lawsuits followed as additional individuals who were entitled to seek damages as the result of the bombing were identified.

47.     As set forth in the chart below (at paragraph 40), the various Defendants

proceeded to list themselves as the attorneys for the plaintiffs in the cases that they filed,

even though all of them arose out of the Marine Barracks bombing.  These follow-on

attorneys used the work product of F&P, and often relationships developed through work

on behalf of F&P, to file cases without F&P.

C.  List of The Follow-On Cases

48.     The "Follow-On Cases" that were filed by the various Defendants, without

including Plaintiffs in the cases, are set forth in the chart below.

| Follow-On Case | Date on which case initiated | Defendants Seeking Fees |
|---|---|---|
| Valore, 03-1959 | 09/16/2003 | Drennan, Gaskill, Donahue |
| Arnold, 06-516 | 03/10/2006 | Drennan |
| O'Brien, 06-690 | 04/17/2006 | Drennan, Donahue |
| Anderson, 08-535 | 03/27/2008 | Drennan, Donahue |
| Taylor, 10-844 | 05/20/2010 | Drennan, Gaskill, Donahue |
| Spencer II, 12-042 | 01/10/2012 | Drennan, Donahue, HNK (plaintiff specific) |

All of these cases were assigned to Judge Lamberth because they were "related" to the

Peterson case, thus he was already familiar with all the facts and evidence produced in the

Peterson case which would be used in the Follow-On Cases.

49.     In each of the Follow-On Cases, the plaintiffs agreed to contingency fee

arrangements under which the attorneys would be entitled to a fee of one-third of the

amount collected for the plaintiffs (as was the arrangement in the *Peterson* case).

Defendants claimed that they were engaged by the plaintiffs in the Follow-On Cases that

they handled and that they are entitled to either two-thirds or three-quarters of the total one-

third contingency fee, depending on the case and the number of FOA involved. Defendants

contend that they are entitled to such fee despite the fact that they did little more in their

cases than was done by the Damages Attorneys, who were paid a fee of 3%.

VII.    THE FOA MERELY PERFORMED THE WORK OF DAMAGES ATTORNEYS

50.    Defendants filed the Follow-On Cases as sole counsel for the plaintiffs in

those cases and failed to include Plaintiffs as counsel listed on the pleadings. Defendants,

however, did little more than the work performed by the Damages Attorneys for the

*Peterson* case.

A. The Follow-On Cases Were Mere Cookie-Cutter Copies of *Peterson*

51.    The Follow-On Cases merely involved repackaging the pleadings and

arguments that were perfected by Plaintiffs in the *Peterson* case. The pleadings presented

were, in all substantive respects, copies of the pleadings in *Peterson*. To obtain judgments,

the Defendants merely asked Judge Lamberth to take judicial notice of the judgment that he

entered in *Peterson* based on the evidence that Plaintiffs so painstakingly collected and

presented in that case. The Defendants did not go to trial in any of the Follow-On Cases,

and the judgments ultimately entered in those cases by Judge Lamberth in the Follow-On

Cases simply referred back to his original judgment in *Peterson*. The plaintiffs in the

Follow-On Cases would have been plaintiffs in *Peterson* if their identities had been known

earlier.

52.    Beyond drafting the cookie-cutter pleadings, the only substantive work

required in the Follow-On Cases was the same as that performed by the Damages Attorneys

Case 1:19-cv-10690   Document 1-1   Filed 11/19/19   Page 16 of 55

in *Peterson*—to acquire the damages evidence for the new plaintiffs in each of the FOA cases.[6]

### B. The Defendants Knew When They Took On the Follow-On Cases That Those Cases Originated with Plaintiffs

53.     Each of the Defendants knew perfectly well that the entire line of work arising out of the Marine Barracks bombing and the *Peterson* case originated with Plaintiffs. When Respondent Gaskill was asked to take on the *Valore* case, he had already been working on that matter as an employee of F&P and knew that he had to do little more than copy the pleadings from *Peterson*.  Mr. Donahue plainly would have learned that when Mr. Gaskill joined him.

54.     Similarly, Defendant Drennan was already under a written agreement with F&P to act as a Damages Attorney when he stepped into the Follow-On Cases.

55.     It is beyond dispute that each of the Defendants knew at the time that they purported to take on the Follow-On Cases that:

a.   F&P originated the claims against Iran arising out of the bombing and was solely responsible for establishing the liability of Iran for that act of terrorism; the Defendants had no involvement in any of this;

b.   Defendants were not involved in any way in F&P's investigation in the Middle East that uncovered the substantial evidence leading to the liability against Iran for the bombing;

c.   Defendants undertook no original investigative work, or any other investigative work, to establish Iran's liability;

---

[6]  Defendants had to undertake certain other tasks that we essentially clerical in nature, including working with translators to create Persian versions of the pleadings, and to effectuate service of process by working with the clerk of the court.

    d.   Defendants were not involved in any way in any of the lobbying and other work completed by Plaintiffs that was needed to secure passage of the legislation that allowed *Peterson* and the Follow-On Cases to go to trial;

    e.   Defendants were not involved in the *Peterson* trial that resulted in the liability judgment;[7]

    f.   Defendants did not create any truly original pleadings; instead, the pleadings in the Follow-On Cases were cookie-cutter copies of the pleadings that F&P prepared in *Peterson*;

    g.   Defendants were not involved in any of the subsequent lobbying and other work completed by Plaintiffs that was needed to secure legislation to codify the federal cause of action and to permit some of the Follow-On Cases to proceed to judgment or the later statute that allowed for collection.

56.    All of this work conferred great benefits upon Defendants, even though they did none of it.  Defendants knew all of this before they undertook any of the Follow-On Cases.  Defendants drafted and filed pleadings in the cases that they handled, they worked and communicated with plaintiffs, and they collected information regarding the damages sustained by individual clients, but that work does not justify the large fees Defendants later collected.  Moreover, as shown in detail below, Defendants played no meaningful role in the eight-year-long collection effort that Plaintiffs labored through in order to collect funds from which Defendants received their large fees.

---

[7]  As noted above, Mr. Gaskill may have participated in minor aspects of the establishment of liability, but as far as Plaintiffs understand it he was then a paid employee of F&P.

VIII.    JUDGMENTS ENTERED IN FOLLOW-ON CASES

57.    Judge Lamberth entered monetary judgments in each of the Follow-On

Cases totaling $1,106,203,678, as listed below:

| Case/Follow-On Case | Date on which Judgment Entered | Judgment Amount | Defendants Seeking Fees |
|---|---|---|---|
| Peterson | 09/07/2007 | $2,656,944,877 | None |
| Valore, 03-1959 | 09/20/2010 | $99,951,568 | Drennan, Gaskill, Donahue |
| Arnold, 06-516 | 09/20/2010 | $19,023,602 | Drennan |
| O'Brien, 06-690 | 03/28/2012 | $10,050,000 | Drennan, Donahue |
| Anderson, 08-535 | 03/20/2012 | $7,500,000 | Drennan, Donahue |
| Taylor, 10-844 | 08/02/2012 | $148,000,000 | Drennan, Gaskill, Donahue |
| Spencer II, 12-042 | 10/14/14 | $102,161,376 | Drennan, Donahue, HNK (plaintiff specific) |

The total amount of judgments entered for the various plaintiff groups, including *Peterson*,

the Follow-On Cases, and other similar cases is $4,268,667,249.00.

IX.    PLAINTIFFS' LONG, EIGHT-YEAR PROCESS TO PURSUE COLLECTION OF
THE JUDGMENTS, WHICH DEFENDANTS TOOK NO ACTION TO PURSUE
DESPITE KNOWING HOW MUCH THEY WOULD BENEFIT

58.    Obtaining more than $4 billion in liability judgments was only the first stage

of the work that the bombing plaintiffs required.  Equally daunting—and the heart of this

Demand—are the significant legal fees that Defendants received because of eight years'

worth of groundbreaking and backbreaking collection work undertaken by Plaintiffs that

involved several years of litigation against multiple banks and large law firms, as well as

extraordinary work in Congress to ensure the passage of necessary legislative relief.

Defendants did not help in those endeavors.  Not one of the Defendants participated in any

of the enforcement or collection efforts, which efforts nevertheless benefitted them greatly, as they fully expected.   The enforcement and collection effort was a massive undertaking, without which none of the Defendants would have received a dime.  Nevertheless, despite the years of effort required to locate, secure, and liquidate Iranian assets for the benefit of the plaintiffs in *Peterson* and the Follow-On Cases, Defendants did not lift a finger to assist Plaintiffs with the collection in any meaningful way, all the while holding out their hands for tens of millions of dollars in fees that they ultimately received solely as a result of the hard work of Plaintiffs.

### A.   The Clearstream Asset

59.    Almost immediately after the judgment was entered in *Peterson*, Plaintiffs set about to search for and seize Iranian assets so that the *Peterson* plaintiffs' judgment would not be an empty one.  That hunt was extremely difficult because Iran had very few, if any, assets in the United States that might be available to satisfy the judgment.

60.    One source of information regarding potential assets that could be seized was the U.S. Office of Foreign Asset Control ("OFAC").  F&P submitted subpoenas to OFAC asking for information pertaining to so-called "blocked assets" of Iran which could theoretically be available for seizure.

61.    In or around June of 2008, Mr. Perles received information in a highly unusual and confidential way from OFAC, alerting him to a transitory Iranian asset that was, for the moment, under the control of Citibank in New York City.  This asset was a form of security that has come to be referred to as the "Clearstream Asset" because of its association with the international securities transfer system known as Clearstream, through which the asset had been moved for the benefit of Iran.

62.    The Clearstream Asset had a value of approximately $2.1 billion.

63.     The Clearstream Asset consisted of cash as well as U.S. denominated security positions, but they were transitory and subject to transfer out of the control of U.S. authorities at any moment.  Mr. Perles had to act quickly and with precision to prevent the Clearstream Asset from slipping away.

B.  Actions Taken to Seize the Clearstream Asset

64.     Once Mr. Perles was notified about the presence of the Clearstream Asset in the United States, Plaintiffs acted extremely quickly to mobilize resources and take other actions to seize the Clearstream Asset.

65.     Among the activities undertaken by Plaintiffs, with the initial participation of David Cook, a collection attorney from California,[8] was the retention of collection counsel in New York City, attorney Liviu Vogel.  Mr. Vogel, acting on instructions from Plaintiffs, served subpoenas and other documents on Citibank, effectively locking up the Clearstream Asset so that it could not move out of the control of United States Courts.

66.     Plaintiffs supervised Mr. Vogel and provided strategic direction to him at all times.   Plaintiffs were in constant email and telephone communication with him, and they either initially drafted, or closely reviewed and edited, every pleading that Mr. Vogel filed. [9] In addition, Plaintiffs were instrumental in fashioning the legal strategy to secure the

_____

[8]  In the first part of 2008, as part of the enforcement efforts, F&P and other attorneys for the *Peterson* plaintiffs engaged David Cook, Esquire, a California attorney who billed himself as an enforcement and collection expert.  As explained in more detail below, F&P fired Cook in September of 2011 for incompetence and failure to perform, which required further efforts from Plaintiffs to ensure that the litigation succeeded. Cook subsequently brought claims against the *Peterson* plaintiffs, Plaintiffs, and others, which had the effect of tying up the assets and preventing distributions, including to Defendants.  Plaintiffs and others undertook the defense of the Cook action at their own expense, with no assistance or financial support from any of the Defendants.  The Plaintiffs defeated all of Cook's claims in their entirety in the arbitration.  See paragraphs 143, *et seq.*

[9] Mr. Vogel was initially retained directly by David Cook, but he was later retained directly by F&P after Mr. Cook was fired.  Mr. Vogel agreed to work on the collection matter in return for a percentage of the amount collected.  At all times, Mr. Vogel worked closely with Mr. Perles and with Edward MacAllister of Perles Law Firm.

Clearsteam asset and supervising Mr. Vogel as that strategy was executed.  Mr. Vogel was

under the constant direction of Plaintiffs in connection with his work on the collection.

67.     Among other things, Mr. Vogel obtained a writ of execution from the U.S.

Marshall, which he took pains to serve on Citibank.  He first went to a Citibank office in

Manhattan, where he was told that he had to go to an office in Queens, all while the clock

was ticking against the potential removal of the asset from the United States.

68.     Counsel for Citibank quickly filed a motion to quash the writ of execution.

Among other things, Citibank contended that the plaintiffs failed to obtain a proper order

under Rule 1610(c) and that the Clearstream Asset did not actually belong to the

Government of Iran.  Mr. Vogel and at least five other people from his firm fought with

Citibank over those issues, with the involvement of Plaintiffs.

69.     Working closely with Plaintiffs, Mr. Vogel also secured and served a writ on

Clearstream after he learned that it had a presence in New York City.

70.     This was a remarkably complicated undertaking.  Among other things, it

involved at least two restraining orders against Citibank and Clearstream, which required an

understanding of the interplay between New York state law on remedies and federal law

and procedure.  Both Citibank and Clearstream moved to quash the writs.

71.     Clearstream, through White & Case, promptly moved to vacate the restraints

on the grounds that the asset belonged not to Iran, but to Clearstream, against whom the

*Peterson* plaintiffs had no judgment.  The filings were extensive, involving oppositions,

replies, and sur-replies.

72.     In June of 2008, the U.S. District Court for the Southern District of New

York held a hearing in the matter. Clearstream argued that the Clearstream Asset did not

belong to Iran.  Clearstream is a company based in Luxembourg; one of the company's

directors, Mark Gem, testified at the hearing.

73.    Establishing that Iran's central bank, Bank Markazi, owned the asset was critical to the ability of the *Peterson* plaintiffs to seize the asset to satisfy the *Peterson* judgment.  The ownership of the Clearstream Asset had to be determined through extensive discovery.

C.    The Extraordinary Efforts to Conduct Discovery

74.    In 2008 and/or 2009, Plaintiffs worked closely with Mr. Vogel to prepare document demands and interrogatories to be served on Bank Markazi and/or Iran, as well as on Clearstream and Citibank.  Mr. Vogel submitted them once complete.

75.    Plaintiffs' contribution to the discovery effort against Bank Markazi was substantial. Among other things, Mr. Perles was able to rely on his connections with intelligence resources to secure a personal meeting with an Israeli intelligence officer with intimate knowledge of how Iran and its bank handled and moved money, and the information that the officer provided to Mr. Perles was of material significance in furthering the discovery into the movement and ownership of the money behind the Clearstream Asset.

76.    Mr. Gem had testified during the hearing in June of 2008 that the Clearstream Asset had actually been transferred from Bank Markazi to Banca UBAE, in Italy.  Banca UBAE had no presence in the United States.  Therefore, depositions of representatives of Banca UBAE could only take place in Italy.  Those representatives were not cooperative, which necessitated four trips to Rome to conduct depositions.  Moreover, the Hague Convention required Plaintiffs, working with Mr. Vogel, to hire local counsel in Rome to participate in the depositions, which added to the complexity of the matter.

77.    Under Italian law and procedure, attorneys do not ask questions at depositions.  Instead, questions are posed by an Italian judge, and attorneys there must work to persuade the judge to ask or avoid certain questions.  Mr. Perles was familiar with the

Case 1:19-cv-10690   Document 1-1   Filed 11/19/19   Page 23 of 55

Italian judge who was assigned to the depositions of the Banca UBAE representatives, and

he shared his knowledge and experience regarding that judge in assisting Mr. Vogel to

prepare to work with the judge at the depositions.

78.     Clearstream also raised issues regarding secrecy under Luxembourg law,

which Mr. Vogel had to research and become familiar with.  That involved the retention of

a banking law attorney in Luxembourg.  Because Clearstream is a major institution in

Luxembourg, it was a challenge to find a qualified attorney willing to take on a matter

adverse to that institution, but Mr. Vogel and Plaintiffs finally located and retained an

expert, with the firm of Vilret-Avocats.

79.     Plaintiffs themselves signed the contract with Vilret Avocats and spent a

considerable amount of time working with them and Mr. Vogel to learn and understand the

law of Luxembourg that could be applied to the Clearstream Asset.

80.     White & Case, as counsel for Clearstream, filed a stream of letter briefs

objecting to and opposing the discovery and other efforts undertaken by Mr. Vogel on

behalf of the *Peterson* plaintiffs.  White & Case also continued its efforts to quash the writ

served on Clearstream, filing numerous papers in that regard.

81.     Plaintiffs worked with Mr. Vogel with respect to these litigation and

discovery efforts; Defendants did not.

   D.  The First Turnover Complaint

82.     The issues pertaining to establishing the ownership of the Clearstream asset

continued to be litigated for years.

83.     In or about 2010, a "turnover complaint" was filed for the *Peterson* plaintiffs

seeking an order directing that the Clearstream Asset be turned over to the Court by

Citibank.  Citibank and Clearstream advanced a major defense to that action.  Plaintiffs

performed major work in the preparation of the turnover complaint; Defendants did not contribute to that work.

84.     The preparation of the turnover complaint was a major task, to which Plaintiffs devoted extraordinary effort.

### E. Experts Were Required For Highly Complex Issues

85.     In 2010 and 2011, in conjunction with pursuing the turnover complaint, the *Peterson* plaintiffs, through the Plaintiffs and Mr. Vogel, also secured various experts and consultants to assist with the complexities of attempting to pursue the collection action against Citibank, Clearstream, Iran, and Bank Markazi.

86.     Finding and retaining experts was a tedious and time-consuming exercise for Plaintiffs.  Potential experts had to be located and qualified, had to agree to non-disclosure agreements, and had to be brought up to speed on the complex factual and legal issues involved.  Plaintiffs were closely involved in the selection and retention of experts.  In fact, Plaintiffs reviewed and signed contracts engaging the experts.  Defendants had no role in the selection or retention of experts, nor did they work with any of the experts.

87.     Moreover, many of the experts in the fields at issue had already worked for or were interested in working for White & Case (the firm representing Clearstream) and/or Davis Wright Tremain (the law firm representing Citibank).  Therefore, certain potential experts were conflicted out of assisting Plaintiffs with the collection effort.

88.     One of the issues that had to be explored with experts included "dematerialized securities" under UCC Section 8.  The Plaintiffs and Mr. Vogel hired Charles Mooney, a law professor from the University of Pennsylvania, to assist with that subject.  Mr. Mooney also assisted Mr. Vogel and Plaintiffs with respect to a number of other issues raised by Clearstream, including the situs of the assets, whether the assets belonged to the Iranians or Banca UBAE, whether Luxembourg law applied, and whether a

dematerialized security can even be transferred.  These were sophisticated and nuanced legal issues that had to be tackled in order to enforce the *Peterson* plaintiffs' judgments against Iran and Bank Markazi.

89.     Mr. Vogel, in conjunction with the Plaintiffs, also engaged the Regulatory Fundamentals Group for expert assistance regarding central banking issues, the indirect holding system under the UCC, and internal processes exploited with respect to securities intermediaries.  These were complex and cutting-edge issues about which no caselaw existed.

90.     Mr. Vogel and Plaintiffs also retained Cari Steinbower of Wiley Rein as an expert.  She was formerly an attorney with OFAC who assisted with respect to the blocking regulations that had been implemented by OFAC, the effect of blocking orders, and whether the Clearstream Asset was subject to such orders.

91.     Ms. Steinbower was needed to help Mr. Vogel and Plaintiffs analyze the implications of TRIA – the Terrorism Risk Insurance Act – which was passed into law in 2002.  TRIA was created to provide a system of compensation for certain losses sustained as the result of acts of terrorism.  Whether and how TRIA applied to the collection efforts in the *Peterson* case were open and significant questions.  One of the key issues to be resolved was whether the Clearstream asset was even an asset of a terrorist party.

92.     Very little law existed on these important questions.  But those issues had to be addressed because part of the turnover action depended on TRIA.  Mr. Vogel and Plaintiffs constructed arguments addressing whether the Clearstream Asset was a blocked asset that Citibank was obligated to retain and was therefore subject to TRIA.

93.     Citibank and Clearstream filed numerous motions and papers opposing the request that the Clearstream asset be turned over to the Court.

94.     Ms. Steinbower was needed, in part, to draft portions of the briefs opposing the motions to dismiss, including the fact that the *Peterson* plaintiffs were entitled to a claim under TRIA to the Clearstream Asset.  Those arguments were fairly new and untested.  Because Mr. Vogel and Plaintiffs were seeking the turnover of an asset worth approximately $2 billion, it was essential that the arguments be as solid as possible, and appropriate experts, such as Ms. Steinbower, were needed and retained in that regard. Defendants did not contribute toward the selection or retention of experts, nor did Defendants work with any experts.

F.   The Entry of Bank Markazi And the Increased Complexity of the Litigation

95.     In the spring of 2011, Bank Markazi entered the action and raised arguments of sovereign immunity under the Foreign Sovereign Immunities Act, particularly section 1611, dealing with the immunity of a central bank.  Bank Markazi also raised constitutional arguments.

96.     Bank Markazi additionally raised arguments under the Treaty of Amity, which had been in place between the United States and the Shah of Iran.  Those arguments also had to be understood and countered.

97.     Bank Markazi's motions substantially added to the legal complexity of the collection action. Bank Markazi filed capable briefs asserting that, as a central bank, it was immune from the collection suit.  That motion unleashed a stream of contentious filings.

98.     In the later part of 2011, the Plaintiffs recognized that the team they had assembled to litigate the Clearstream collections matter needed additional help. They then hired New York Attorney James Bonner of the firm of Stone, Bonner, and Rocco to work on the collection case and to help defeat the arguments advanced by Bank Markazi.  Mr. Bonner had previously worked with Plaintiffs on another matter involving terrorist acts. Mr. Bonner was a valuable and essential member of the collection team.  He worked on all

of the briefs, discovery, strategizing, and virtually all aspects of the case. Defendants had
no role in selecting or retaining Mr. Bonner, or in any of the work described above.

G. The Tidal Wave That Bore Down on Plaintiffs

99.     At the same time that Mr. Vogel, Mr. Bonner, and Plaintiffs were dealing
with the sophisticated arguments advanced by Citibank, Clearstream, and Bank Markazi,
Citibank initiated interpleader actions bringing into the *Peterson* collection action every
creditor with a judgment claim against the assets of Iran. This involved a large number of
judgment creditors, and the Court wanted to give Citibank the opportunity to interplead all
such parties. Plaintiffs were required to deal with all of them.

100.    In 2011, as Citibank interpleaded the other judgment creditors of Iran, a tidal
wave of work arose, which included Bank Markazi's motion to dismiss, multiple motions
filed by Clearstream, additional motions to have the restraints lifted, and the entry of Banca
UBAE into the case. The Plaintiffs, together with Mr. Vogel and Mr. Bonner, were faced
with, and responded to, a kitchen sink of pleadings, motions and papers submitted by the
opposing parties. In dealing with the flood of work, Plaintiffs were actively and intensely
involved in each pleading and strategic decision in the Clearstream collection litigation.

101.    The *Peterson* plaintiffs and Plaintiffs were faced with talented and
sophisticated legal counsel on the other side, who raised complex and unique arguments
that had not previously been widely litigated or reported, if at all. Because of the lack of
precedent, the Plaintiffs were concerned throughout the collection process, and up until they
received a favorable ruling from the U.S. Supreme Court in 2016 (described below), that
they would not prevail in the collection effort for the *Peterson* plaintiffs.

102.    Herculean efforts were expended by the Plaintiffs to achieve success, which
they ultimately obtained only after years of backbreaking litigation and legislative efforts.
These efforts by Plaintiffs included devoting all of their time and effort to drafting and

editing pleadings, conducting research, and working closely with New York counsel to implement a coordinated strategy to fend off the numerous powerful attacks coming from multiple directions. Defendants were not involved.

H. The Intervenors

103. At and before this time, other judgment creditors with judgments against Iran were taking actions to intervene or become involved in the *Peterson* collection action. For example, a group of judgment creditors referred to as the "Greenbaum" plaintiffs, represented by Strook & Strook & Levan,[10] intervened in the case, as did another group of judgment creditors referred to as the "Heiser" plaintiffs, represented by DLA Piper.

104. The intervention of these other creditor groups significantly complicated the efforts of Plaintiffs to effectuate collection for the *Peterson* plaintiffs. Among other things, these other creditors raised serious questions of priority—that is, who had first right to attach and collect from the Clearstream Asset.

105. These questions played a key role in the eventual negotiation of an agreement under which the *Peterson* plaintiffs agreed to share a portion of the Clearstream Asset with those other groups. This "sharing agreement" is described in more detail below (see paragraphs 126 *et seq.*).

I. Executive Order 13599, 22 U.S.C. §8772, and the Second Turnover Complaint

106. In February of 2012, President Obama issued Executive Order 13599, which essentially froze the assets of Bank Markazi and made them subject to execution under TRIA. That Executive Order came about from the tireless efforts and extraordinary work of Mr. Perles. It was only because Mr. Perles recognized the strategic importance of such

---

[10] For purposes of this Demand, Plaintiffs are not addressing the nature or propriety of actions taken by certain attorneys to facilitate the intervention by the Greenbaum plaintiffs and related parties.

an Executive Order to the litigation that the Order was sought. As with the discovery itself of the Clearstream Asset, this critical step in securing it for the bombing plaintiffs simply could not have happened without Mr. Perles's unique combination of savvy, connections, and diligence. Defendants played no role whatsoever.

107. After Executive Order 13599 was issued, Plaintiffs and Mr. Bonner asked for and obtained a new briefing schedule from the Court in order to address the effect of the Executive Order on Bank Markazi's arguments.

108. In March of 2012, the Plaintiffs filed a Second Amended Complaint seeking the "turnover" of the Clearstream Asset from Citibank and Bank Markazi. The preparation of that pleading required a considerable amount of work. Because Plaintiffs knew that this pleading would be subject to fierce attack from the major law firms representing the opposing parties, substantial effort went into drafting, revising, refining, and finalizing it. Plaintiffs, including Mr. Perles and attorney Edward MacAllister of Perles Law Firm, devoted extraordinary effort to the preparation of this critical pleading.

109. As expected, the opposing parties promptly moved for the dismissal of the Second Amended Complaint and to have the restraints vacated. Plaintiffs again devoted an extraordinary effort to responding to those motions; Defendants did not.

110. Around the same time, Plaintiffs were critically involved in another extraordinary effort: the passage of legislation codified as 22 U.S.C. §8772, without which the plaintiffs would not have been allowed to execute on the Clearstream Asset. That statute eventually became a focal point for the rulings that permitted the *Peterson* plaintiffs to collect against the Clearstream Asset.

111. Section 8722 was the result of Mr. Perles's vision and came about through the unique set of relationships and understanding of the United States Congress that Mr. Perles had.

112.    In addition to his work envisioning and drafting section 8772, Mr. Perles, along with Mr. MacAllister of Perles Law Firm, spent many weeks negotiating the form of the statute.   Furthermore, Mr. Perles and a consultant retained by Mr. Perles spent many days in close and difficult negotiations with the staff of Senator Bob Menendez (D-NJ) to effectuate the passage of the legislation.  This effort was complicated by the recognition that the constitutionality of section 8722 would likely be challenged in the Clearstream litigation – and in fact it was, all the way to the United States Supreme Court.

113.    The legislation was fiercely opposed by the banking industry. In particular, DTC, a major financial institution involved in bond trading, led an aggressive opposition to the legislation.

114.    Mr. Perles and Mr. MacAllister took measures during the drafting and passage of section 8722 to position the law to be able to withstand the expected constitutional challenges.  They undertook extensive work to ensure that the U.S. Department of Justice would not be in a position to undermine the section 8772 statute on constitutional grounds.  As noted above, the banking industry was opposed to the legislation, and pressure from that industry resulted in the eventual statute becoming narrow, to the point where one could argue that it was unconstitutional.  To prevent the DOJ from supporting such an argument, Mr. Perles worked closely with the staff of Senator Menendez (including Jodi Herman) to secure an opinion from the DOJ to the effect that the statute is constitutional.  That left no room for the DOJ to argue later that the statute is unconstitutional.  Mr. Perles thereby effectuated the avoidance of a potentially devastating argument from the DOJ.  The fact that the DOJ could not and did not argue that the statute is unconstitutional was a significant factor in the eventual ruling that held that the statute is constitutional.

115.     As a result of the intense lobbying efforts of Mr. Perles (with the assistance of Mr. MacAllister and the consultant engaged by Mr. Perles), section 8772 became law on August 10, 2012. The statute served as one of the bases on which the U.S. Supreme Court ultimately permitted the collection of the Clearstream Asset, and the eventual distribution of fees to Defendants, to proceed.  *See* 136 S. Ct. 1310 (2016).

J.     Judge Forrest of S.D.N.Y. Orders the Turnover of the Clearstream Asset

116.     In March of 2013, Judge Katherine B. Forrest of the Southern District of New York, who was presiding over the complex *Peterson* collection action, granted summary judgment in favor of the *Peterson* plaintiffs, in large part on the basis of 22 U.S.C. §8772 and Executive Order 13599, both of which were brought about through the efforts and unique expertise of Plaintiffs.

117.     By Order entered on July 9, 2013, Judge Forrest directed Citibank to turn over the Clearstream Asset to the Court.  At that time, the Court also entered other orders establishing the "Qualified Settlement Fund," referred to as the "QSF," into which the proceeds of the Clearstream Asset were to be deposited.  The Court appointed retired Judge Stanley Sporkin as the Trustee of the QSF.

118.     These Orders were a rejection of the arguments advanced by Bank Markazi, outlined above.  In order to advance its arguments, Bank Markazi had to admit in its motion before the S.D.N.Y. that it owned the Clearstream Asset, which admission was carried forward into Bank Markazi's appeal.

K.     Bank Markazi Appealed to the Second Circuit

119.     Bank Markazi promptly appealed these Orders to the Second Circuit.  Like every other aspect of the collection case, the Second Circuit case was a complex and detailed undertaking that involved significant and substantial work by Plaintiffs.

120.    Plaintiffs worked tirelessly on the briefs involved in the Second Circuit appeal.  Defendants did not participate.

121.    Among other things, the issues brought before the Second Circuit involved TRIA, the constitutionality and applicability of section 8772, and the separation of powers. Other issues involved personal jurisdiction arguments and issues pertaining to the Treaty of Amity.

122.    The Second Circuit ultimately sustained the Orders entered by the S.D.N.Y. in directing the turnover of the Clearstream Asset and the establishment of the QSF.  The decision of the Second Circuit, however, did not end the matter.

L.    The Case Proceeded to the U.S. Supreme Court

123.    In 2015, Bank Markazi took the case to the U.S. Supreme Court, which eventually agreed to hear the case.  The decision of the Supreme Court to entertain argument on the case was of huge concern to the Plaintiffs: an adverse decision would mean that the years put into the collection effort up to that point would have been wasted because the *Peterson* plaintiffs would have been barred from collecting against the Clearstream Asset.  Therefore, Plaintiffs put great effort into opposing the appeal.  Defendants again did not participate.

124.    The Plaintiffs engaged Ted Olson (one of the leading appellate advocates in the country) and Matt McGill of Gibson Dunn to handle the Supreme Court argument.[11] Mr. Olson and Mr. McGill worked with Messrs. Perles, MacAllister, Vogel, and Bonner on the Supreme Court case.

_____

[11]  Although Plaintiffs worked closely with Mr. Olson and the Gibson Dunn team with respect to the Supreme Court appeal, the fees of Gibson Dunn were paid by Thomas Fay.

125.    The Supreme Court asked the Solicitor General as to whether the Court should grant *certiorari*.  Plaintiffs and counsel met with the Solicitor General's Office to encourage that office to recommend that *cert* be denied. The conferences with the Solicitor General required extensive work and effort by the Plaintiffs and the Gibson Dunn team. This work paid off: the Solicitor General eventually filed a brief urging that the *cert* petition be denied.  But the Supreme Court rejected the opinion of the Solicitor General, and it elected to grant *cert* and to hear arguments in the case.  This caused even greater concern for the Plaintiffs.

126.    The case before the Supreme Court did not involve any clear legal precedent. It presented the question of whether Congress could adopt 22 U.S.C. § 8772, which could be characterized as a legal rule which appeared to have been created just for the *Peterson* collection case., as Mr. Perles anticipated.  The new statute, which was critical to the turnover of the Clearstream Asset, was a focal point of the arguments before the Supreme Court.  As noted, Plaintiffs were solely responsible for the drafting and eventual passage of the statute.

127.    Numerous amicus briefs were filed in the case, including briefs from law professors, one from former senior officials of the Office of Legal Counsel, a brief from 225 individual members of the House of Representative, and briefs from Senators Whitehouse, Graham, Cruz, and Coons.  Plaintiffs, along with the Gibson Dunn team, went to great lengths to secure the briefs from the House and Senate.  Those efforts required personal meetings with the staff of Congressional leadership and their counsel, and they also involved a floor vote by the Senate, which required securing the agreement of Senator McConnell.

128.    Preparing for the argument before the Supreme Court involved numerous moot court exercises that Plaintiffs extensively prepared for and attended.

129.    Ultimately, on April 20, 2016, the U.S. Supreme Court entered a 6-2 ruling essentially in favor of the victims and against Bank Markazi, which allowed the distribution of funds to the victims to commence.  *See* 136 S. Ct. 1310 (2016).

M. Conclusion of the Collection Litigation

130.    When the Supreme Court issued its ruling in April of 2016, eight long years after Plaintiffs began the Clearstream collection efforts, the *Peterson* plaintiffs were finally in a position to recover money for the judgments they had obtained against Iran.  They had faced a stiff uphill climb with no guarantee of success.

131.    The collection efforts spanned eight years of hard work against some of the largest and most experienced law firms in the country.  They involved complex and cutting-edge legal arguments, many of which had little or no established law behind them. And Plaintiffs had to pursue the collection action through every branch of the U.S. government: they lobbied Congress, secured the passage of new laws, worked with the White House to secure an Executive Order, and litigated one of those new laws all the way through a divided  Supreme Court, which itself involved obtaining amicus briefs from both the Senate and the House in support of the plaintiffs.

132.    Throughout this long and tedious eight-year process, the Defendants were wholly uninvolved and silent.  The Defendants did not draft a single paper, did not extend a single dime, did not confer with any experts, did not engage substantively in any court appearances,[12] were completely uninvolved in lobbying, did nothing to bring about either 22 U.S.C. §8772 or Executive Order 13599, and were otherwise absent from the entire collection process.

---

[12] Some of the Defendants appeared in court in a handful of instances, but only to announce their presence in the courtroom and to sit in the gallery; they did not participate otherwise.

133.     Nevertheless, after all of this effort, Defendants have asserted that they are entitled to tens of millions of dollars in fees that never would have been realized but for the hard work of Plaintiffs, even though they provided no meaningful input other than the collection of damages evidence.

X.     THE SHARING AGREEMENTS

134.     In eight long years during which the Plaintiffs labored to achieve collection of the Clearstream Asset for the benefit of the *Peterson* plaintiffs (between 2008 and 2016), judgments were entered in the Follow-On Cases, as noted in the chart above (paragraph 49).

135.     Because the judgments entered in the Follow-On Cases were entered after Plaintiffs initiated and began to pursue the enforcement and collection actions in New York for the *Peterson* plaintiffs, the plaintiffs in the Follow-On Cases technically were not entitled to participate in the distribution of funds from the QSF.  Yet, through more hard work, Plaintiffs brought about a sharing arrangement that resulted in all of the plaintiffs in all cases sharing in the recovery.  Defendants took advantage of that situation to demand and receive tens of millions of dollars in fees.

136.     If the plaintiffs in the Follow-On Cases had not been able to receive distributions from the QSF, then Defendants, who only claimed contingency fees, would have received nothing as a result of the QSF.

137.     Nevertheless, Mr. Perles, with the agreement of representatives of the *Peterson* plaintiffs, worked for and obtained the consent of the *Peterson* plaintiffs to open up the QSF to the plaintiffs in all of the Follow-On Cases.  This was accomplished via several agreements, including an agreement in February of 2012 known as the Marines Cooperation Agreement and a subsequent agreement entered into in June of 2012, which also included the other claimants to the QSF (those not arising out of the bombing), which

was known as the Litigation Cooperation and Settlement Agreement.[13]  These agreements are often referred to collectively as the "Sharing Agreements."

138.    The Marine plaintiffs (victims and family members) agreed to the sharing arrangements because of the philosophy of the Marine Corps that leaves no Marine behind. Their attitude was that all of the victims of the bombing needed to share in the recovery. Remarkably, all of the hundreds of plaintiffs agreed to the sharing of the recovery; not a single one objected.

139.    Nevertheless, the fact that the plaintiffs themselves agreed to share the recovery did not mean that the attorney fees that otherwise would have been paid to Plaintiffs were suddenly reallocated to Defendants or to any other attorneys who did minimal work.  Indeed, the families agreed to the sharing arrangement rather than gifting money to the plaintiffs that otherwise would have been precluded from the recovery due to priority issues because such gifting probably would have resulted in tax liabilities. Defendants have seized on the generosity expressed by the *Peterson* plaintiffs to the plaintiffs in the Follow-On Cases to demand and receive attorney fees from the sharing, when that was never the intent of the sharing arrangement.

140.    In any event, Defendants are clearly the beneficiaries of those agreements and the work that Plaintiffs did to bring about the Sharing Agreements; without them, Defendants would have received no fees at all.

---

[13]  The Litigation Cooperation and Settlement Agreement contains the arbitration clause that pertains to the instant arbitration.  See paragraph 5.

## XI. DISTRIBUTIONS FROM THE QSF

141.    As a result of the Sharing Agreements and various court rulings, and the hard work of Plaintiffs, the amount of funds that were eventually allocated for the benefit of the victims of the Marine Barracks bombing was $1,895,672,127.[14]  Defendants had no role in collecting those funds.

142.    In late 2016, the Trustee began making distributions from the QSF. Distributions are ongoing as of the time of the filing of this Complaint.

143.    The distribution process has been complex. It involves over 1400 plaintiffs. It has required the work of the lawyers and accountants advising the Trustee, and it also involved various "advance companies," which had provided payments to a number of plaintiffs in advance of the distributions from the QSF in return for reimbursements from the QSF, plus interest payments.  The distributions also have to account for a number of expense items.  Others involved in the distribution included EPIQ, which has been coordinating and disbursing the distributions, and UBS, which holds the fund assets.

144.    Despite the complexity of the distribution process, and despite the fact that they claimed entitlement to a portion of the distributions to the plaintiffs that they claimed to represent, Defendants essentially did not participate in the distribution process, other than to inject themselves in response to Plaintiffs' contentions that they were not entitled to all of the fees that they demanded.  Otherwise, Defendants sat back and waited for money to come to them.

_____

[14] This represented 87% of the total amount collected.  The other 13% went to plaintiffs in other, unrelated cases that had received judgments against Iran for different acts of terrorism, including the plaintiffs in the *Greenbaum* and *Heiser* actions, who intervened in the *Peterson* collection matter, as mentioned in paragraph 95.

145.    Defendants knew perfectly well that Plaintiffs were working hard on collection and were responsible for the distributions eventually made to the plaintiffs, and ultimately to Defendants themselves.

146.    Most, if not all, of the Defendants, for example, were provided with copies of the Trustee's Monthly Reports, beginning in November of 2013, which showed the huge amount of money set aside in the QSF.  Defendants obviously knew that they had done nothing to help create that fund.  All Defendants were named in drafts of letters to the plaintiffs informing them of matters pertaining to the collection litigation, such as appeals and settlement negotiations with Clearstream.  Many or all of the Defendants were provided with drafts of various motions that Plaintiffs were responsible for.  Nevertheless, Defendants did not step up to assist in any material way in the ongoing collection effort.

147.    Distributions from the QSF began in November of 2016.

148.    Liviu Vogel, Jim Bonner, and Keith Fleischman – the so-called "New York Attorneys" who were hired to aid in collection – received attorney fees "off the top" of the QSF, *i.e.* from the gross attorney fees to be paid from the collection.  Their fees were paid by *pro rata* contributions from all of the other attorneys, *including Defendants*, proving that Defendants knew the collections work was done on their behalf and that they should help fund its cost.  Furthermore, the fact that the New York Attorneys were paid by all of the other attorneys, including Defendants, for their work pursuing the collection shows that Defendants were aware of the fact that those who actually worked on the collection intended to and deserved to be paid.

149.    Because Defendants helped fund this portion of the collections work (*i.e.*, the work of the New York Attorneys), the fees sought as damages from Defendants here do not include fees paid to the New York Attorneys.

150.    As of March 31, 2019, and after the New York Attorneys had been paid "off the top," Respondents had received the following distributions of attorney fees:

Joseph Peter Drennan:        $13, 864, 018

Dan Gaskill:        $9,477, 876

Patrick Donahue:        $10, 254, 470

## XII.    DAVID COOK'S THREATS TO THE QSF AND DEFENDANTS' FAILURE TO PARTICIPATE IN THE DEFENSE

151.    As noted above, attorney David Cook was originally engaged by F&P in 2008 to search for and secure Iranian assets for the *Peterson* plaintiffs.  Cook was fired in September of 2011 for incompetence and other reasons. [15]

152.    In May of 2016, Cook filed a notice of charging lien in the original *Peterson* action.

153.    Cook asserted that he was responsible for the collection of the Clearstream Asset and that he was entitled to a fee of approximately $190,000,000, which he sought from the funds to be paid to the plaintiffs.[16]

154.    Also in May of 2016, Cook filed a demand for arbitration before JAMS against Plaintiffs.  Cook also named as Defendants in that action Thomas Fay and his law firm, as well as attorneys Allen Rothenberg and Anthony LaSpada, who had referred plaintiffs into the *Peterson* action.  In his arbitration action, Cook claimed that he had been wrongfully fired, that he had earned his fee, and that he was entitled to $190,000,000, the same amount that he sought from the plaintiffs in the *Peterson* action via his charging lien.

---

[15]  See footnote 8 regarding Cook's initial involvement as a collection attorney.

[16]  More specifically, Cook's charging lien demanded 10% of the gross amount collected by the plaintiffs, which equated to approximately $190,000,000.

155.   Cook's actions were therefore a direct threat to all of the plaintiffs, and by extension to any attorney representing a plaintiff, including Defendants.

156.   Even though Cook's actions threatened their purported clients and their own potential recovery, Defendants did absolutely nothing to assist Plaintiffs in defending against, and otherwise resisting, Cook's demands.  Defendants again sat back and let Plaintiffs do all of the necessary work and spend the necessary funds.

157.    In responding to Cook's claims and demands, Plaintiffs undertook a number of actions for which they incurred considerable expense.  Among other things, they filed a motion to quash the attorney lien that Cook filed in the *Peterson* case.  That motion to quash was granted by Judge Lamberth.

158.   Cook then appealed the quashing of his lien to the U.S. Court of Appeals for the D.C. Circuit.  Plaintiffs again expended time and resources participating in that appeal. Defendants again did nothing.  Plaintiffs were again successful:  The Circuit Court eventually affirmed Judge Lamberth's order quashing the lien.

159.   The arbitration matter dragged on for years.  As it continued, Cook expanded his complaints to include threats against the Trustee himself, warning the Trustee not to disburse funds in the face of Cook's claims.  Those threats had the intended effect of causing the Trustee to freeze further distributions, including the distribution of fees to Defendants.  Yet Defendants remained uninvolved.

160.   Cook's arbitration action culminated in a complex nine-day, full evidentiary hearing, with several rounds of briefing, in New York before The Hon. Stephen Crane (ret.).

161.   Justice Crane entered a Final Award on June 21, 2018, over two years after Cook threw his monkey wrench into the collection efforts.  Justice Crane concluded, in a

64-page written opinion, that Cook had failed to prove that he was entitled to any fees. Justice Crane entered an award in favor of Mr. Perles and the other Defendants in that case.

162.    The effect of Justice Crane's Final Award in the Cook arbitration was to free up $190,000,000 in funds for distribution to plaintiffs and to Defendants. Defendants did not participate in any way in defeating Cook's claims or in obtaining the favorable outcome in the arbitration initiated by Cook.

163.    Furthermore, Cook did not accept his defeat in the arbitration, instead promptly notifying the parties there that he intended to challenge the award in court, including via appeals, if necessary. Cook also continued his threats to the Trustee, warning him against distributing the approximately $190,000,000 that he claimed.

164.    To put an end to the Cook matter and ensure that the Trustee have no impediment to disbursing the $190,000,000 that Cook claimed, Plaintiffs and the other Defendants in the Cook arbitration matter entered into a settlement with Cook, in which Plaintiffs funded part of the settlement from their own pocket. As the terms of that settlement are confidential, the terms will not be disclosed absent an order from the Arbitrator in this action and the agreement of Defendants herein to maintain the confidentiality of those terms.

165.    Defendants did not participate in the settlement with Cook or contribute any funds to that settlement, even though they directly benefitted from the resolution of Cook's claims against the funds held in the QSF.


XIII.   THE CLAIMS BY JOEL RUBIN

166.    Another individual who threatened the collection process is Joel Rubin, a lobbyist originally retained by Cook.

Case 1:19-cv-10690  Document 1-1  Filed 11/19/19  Page 42 of 55

167.     Rubin claimed that he did work while under contract with Cook.  After Cook was fired, Plaintiffs allowed Rubin to continue working to secure the collection.

168.     After the QSF was established and the Trustee started making distributions, Rubin demanded to be paid.  He filed a lawsuit against Cook in California demanding damages under his contract with Cook.

169.     But Rubin also demanded fees from the QSF on the grounds that he continued to work for the benefit of the Marine Barracks bombing plaintiffs after Cook was terminated.

170.     Rubin demanded to be paid $5,692,000 in connection with his work fostering legislation related to the collection.

171.     As part of their defense strategy, and in order to simplify the Cook arbitration, Plaintiffs agreed to take on responsibility for Rubin, including by indemnifying Cook with respect to Rubin's claims and by negotiating directly with Rubin's counsel to relieve the threat to  the QSF posed by his demand.

172.     Ultimately, Plaintiffs negotiated a settlement with Rubin, which relieved the QSF of the burden of his claim for fees.  Plaintiffs funded their portion of the settlement with Rubin out of their own pocket.[17]  As the terms of that settlement are confidential, the terms will not be disclosed absent an order from the Arbitrator in this action and the agreement of Defendants herein to maintain the confidentiality of those terms.

173.     Defendants did nothing to assist Plaintiffs in the negotiations or settlement with Rubin, even though Rubin's claims threatened to diminish the QSF and thereby the recovery of their own fees.

—————————————————

[17]  Other attorneys, not including any of the Defendants, also contributed to the settlement.

XIV.   THE CLAIMS BY JAY GLENN

174.   Jay Glenn, an attorney originally retained by F&P as a damages attorney, is yet another individual who threatened the QSF.

175.   In addition to the 3% fee to which he was entitled as a damages attorney, Glenn claimed that he was further entitled to one-third of the total one-third attorney fees related to a group of individuals that Glenn claimed to have referred into the original *Peterson* case.

176.   Plaintiffs and attorney Thomas Fay disputed Glenn's entitlement to fees on the grounds that he failed in his job as a damages attorney and that he did not actually refer any individuals into the *Peterson* case.

177.   On May 26, 2016, Glenn filed a Notice of Charging Lien in the *Peterson* action, which he amended on June 1, 2016.  The amount that Glenn claimed, which changed periodically depending on certain variables, was approximately $19,600,000.  This represented another threat to the assets in the QSF from which Defendants claimed attorney fees.

178.   Plaintiffs, with no assistance from Defendants, successfully quashed Glenn's liens.

179.   Glenn also filed two separate lawsuits against Plaintiffs in the U.S. District Court in D.C.

180.   Plaintiffs ultimately negotiated a settlement with Glenn, which relieved the QSF of any claims that Glenn had against the QSF funds, and which allowed the Trustee to continue to distribute funds, including fees to Defendants, free and clear of any threat from Glenn.

181.   Plaintiffs and others, but not including any of the Defendants, funded the settlement with Glenn.  As the terms of that settlement are confidential, the terms will not

be disclosed absent an order from the Arbitrator in this action and the agreement of Defendants herein to maintain the confidentiality of those terms.

182.    Even though Defendants benefitted from Plaintiffs' efforts against Glenn, they did not participate or otherwise assist in those activities in any way.

XV.    PLAINTIFFS' CONTINUING EFFORTS
       TO COLLECT FOR THE BOMBING VICTIMS

183.    Although the amount sequestered for the bombing victims is almost $1.9 billion, it is less than half of the total damages awards obtained by the plaintiffs.  The total compensatory damages judgments entered in favor of all of the plaintiffs is $4,268,667,249. Therefore, the Plaintiffs are entitled to collect an additional $2,372,995,122 from Iran.

184.    Although they claim that they are entitled to significant fees from any future recoveries, Defendants are doing absolutely nothing to assist in the search for Iranian assets or otherwise collect on the judgments in the Follow-On Cases.

185.    Instead, Plaintiffs, and Plaintiffs alone, are continuing to search for and attach Iranian assets.

186.    Plaintiffs have made significant progress in that respect.  Among other things, Plaintiffs are responsible for actions against two particular assets in New York City:

    a.    "Clearstream II," another large securities asset; and

    b.    "650 Fifth Avenue," an office building located in Manhattan.

187.    As it was with the Clearstream Asset, the work involved to identify, seize, and pursue these assets has been a massive undertaking, requiring exhaustive work by Plaintiffs and the outlay of significant expenses.  Plaintiffs have been involved in pursuing these assets, and in pitched battles in court, for several years already, and it will likely require several more years of work before it is known whether the assets will be made available to the bombing plaintiffs.

188.     Despite the years of effort already involved, and the years of effort yet to come, Defendants have not lifted a finger to assist in these collection efforts in any way. They have offered neither a minute of time nor a penny of their money toward the effort. They have nevertheless made it clear that, if Plaintiffs succeed in liquidating those assets, Defendants expect to receive significant additional fees.

189.     The injustice and inequity of Defendants' position in this regard is manifest.

190.     Should Plaintiffs eventually succeed with these or any other collection efforts for the bombing victims, Defendants are entitled to no more than the 3% amount that was deemed appropriate for the damages attorneys.  Anything in excess of that amount would be a gross injustice.

XVI.   PLAINTIFFS' EXPOSURE FOR FEES CLAIMED BY
       ALLEN ROTHENBERG THAT WERE PAID TO DEFENDANTS

191.     Defendants' receipt of attorney fees from the QSF in connection with the follow-on cases, as outlined, in paragraphs 49 and 142, leaves Plaintiffs exposed to claims for attorney fees that Philadelphia attorney Allen Rothenberg ("Rothenberg") may make in connection with the original *Peterson* action.  As explained below, if Rothenberg succeeds on his eventual claims against Plaintiffs—which he should not, because they are without merit—it will mean that part of the money to which he is entitled is money that has been disbursed to Defendants, yet which Plaintiffs will be liable to pay to Rothenberg.

192.     Rothenberg referred a number of plaintiffs into the original *Peterson* lawsuit. In return for his referral, Rothenberg expected to receive one-third of the total attorney fees payable out of the collections realized by the clients that he referred.

193.     Rothenberg claims that, as a result of the Sharing Agreements (described in paragraphs 126 – 132), according to which the *Peterson* plaintiffs agreed to share the Clearstream Asset with the bombing plaintiffs in the Follow-On Cases, the amount of fees

that Rothenberg expected to receive from the original *Peterson* case was diminished or diluted. That is because, Rothenberg argues, the *Peterson* plaintiffs—and by extension, their attorneys—realized less from the collection of the Clearstream Asset, as paid from the QSF, because part of the asset was shared with non-*Peterson* plaintiffs.

194.    Rothenberg has claimed informally (*i.e.*, not in litigation) that Plaintiffs entered into the Sharing Agreements without his consent, and therefore that Plaintiffs are responsible for the difference between the amount of fees that Rothenberg allegedly would have received without the Sharing Agreements and what he actually received from the QSF under the Sharing Agreements. Rothenberg has demanded that Plaintiffs pay him many millions of dollars in this regard.

195.    Plaintiffs dispute Rothenberg's entitlement to any additional fees. Nevertheless, should it come to pass that Rothenberg prevails on a claim against Plaintiffs for additional fees, then Plaintiffs themselves would have to pay Rothenberg for the attorney fees that went to the Follow-On Attorneys. In other words, if it is determined that Rothenberg is entitled to additional fees from Plaintiffs, then Defendants are in possession of those additional fees.

196.    If Rothenberg establishes that he is entitled to fees, then Defendants must pay Plaintiffs for the fees in Defendants' possession that would be paid to Rothenberg.

197.    These facts further demonstrate the inequity of Defendants' retaining the fees that they received from the QSF. Defendants must indemnify Plaintiffs against any ultimate liability that Rothenberg establishes against Plaintiffs.

XVII.  THE CLAIMS AGAINST DEFENDANTS

198.    Defendants benefitted handsomely from the collection process and the defeat of claims advanced by Cook, Rubin, and Glenn. Yet they took no actions whatsoever to

assist in those efforts.[18]  Among the Defendants' numerous failures in this regard are the following:

  c.  they failed to take any action to hunt for or identify Iranian assets that could be used to satisfy the judgments;

  d.  they failed to participate in any communications with OFAC regarding any blocked Iranian assets that might be available to satisfy the judgments;

  e.  they had no role in the identification of the Clearstream Asset;

  f.  they failed to participate in any actions to seize and secure the Clearstream Asset;

  g.  they failed to participate in any of the enforcement actions filed in SDNY, which were geared toward the collection of the Clearstream Asset;

  h.  they failed to participate in any of the litigation in SDNY, which churned along for many years against some of the largest law firms in the country;

  i.  they did not participate in any way in the extensive lobbying that Plaintiffs undertook to secure legislation that made the collection possible;

  j.  they took no part in the extensive motions practice that led to the creation of the QSF;

  k.  they failed to participate in the appeal to the Second Circuit;

  l.  they failed to participate in the appeal before the U.S. Supreme Court;

  m.  they failed to participate in defending against David Cook's actions in court or in the JAMS arbitration dispute;

---

[18]  Moreover, there is yet another claim that Plaintiffs are defending, brought by attorney Colleen Delaney, who has filed a suit in the S.D.N.Y. demanding attorney fees in excess of $50 million.

    n.   they failed to participate in defending against Joel Rubin's demands against the funds;

    o.   they failed to participate in defending against Jay Glenn's threat to the funds;

    p.   they have failed to participate in any way in the efforts to collect against additional Iranian assets, including the Clearstream II and 650 Fifth Avenue assets, and have indicated no intention to participate in any other collection efforts now or in the future, instead leaving all such activities and expenses to Plaintiffs.

199.    Even though all of these activities ultimately benefitted and enriched them, Defendants did not participate in any of them. Even though Defendants literally received millions of dollars as a direct result of these activities, they did absolutely nothing to participate in them or to foster them.[19] Even though Defendants claim that they are entitled to additional fees, in the millions of dollars, from present and future collection activities, they have done nothing to participate in such activities and have not indicated that they ever will.

200.    In short, Defendants have benefitted handsomely from the work and efforts of Plaintiffs, and they will continue to do so benefit from future work and efforts by Plaintiffs, without having contributed to any such activities.

A.    COUNT I:  Unjust Enrichment

201.    Plaintiffs incorporate all of the preceding paragraphs as though recited here.

202.    The activities described above show that Defendants were enriched at Plaintiffs' expense. It would be against equity and good conscience to permit Defendants to retain the benefit of Plaintiffs' work, to which they did not contribute.

---

[19] Indeed, Plaintiffs further submit, on information and belief, that Defendants also applied for and received reimbursement for expenses related to the prosecution of the cases that they handled at the trial level.

203.    Plaintiffs are entitled to an award of damages based on the amount of benefit retained by Defendants.

204.    As explained above, Defendants would have received nothing from any of the cases that they claim to have handled but for the efforts of Plaintiffs, as described above.

205.    The most that Defendants should have received in connection with the cases that they worked on is little more than the 3% agreed-upon rate for the work that the Damages Attorneys performed in the *Peterson* case.  As explained above, the work that the FOA did in the cases that they handled was little more than the work done by the Damages Attorneys, and therefore the same 3% fee award, with, at most a small bump for having drafted the cookie-cutter pleadings, should equitably be applied in determining the measure of the benefit conferred on Defendants by Plaintiffs in this case through the collection work that Plaintiffs performed.

206.    The amount to which Defendants are entitled for the vast bulk of their work—*i.e.*, collecting evidence of damages—is detailed below:

Joseph Peter Drennan:        $1,713,754.94

Dan Gaskill:        $1,023,240.83

Patrick Donahue:        $1,713,754.94

207.    The benefit that Defendants wrongfully retained, therefore, approaches $29,145,613.29.

208.    That approximates the amount of damages that should be awarded in this matter.  F&P is entitled to the entire $29,145,613.29.  Mr. Perles, Plaintiffs, as an equal partner of F&P, is entitled to 50% of that amount—approximately $14,572,806.64.[20]

209.    Furthermore, any fees paid out in connection with future recoveries should be based on a rate of 3% of the gross amount collected for each plaintiff, plus some small increase for the drafting of the cookie-cutter pleadings, to be calculated after the payment of expenses (not including attorney fees).

B.  COUNT II:  Quantum Meruit

210.    Plaintiffs incorporate all of the preceding paragraphs as though recited here. As explained above, Plaintiffs performed all of the activities and services described above in good faith.

211.    Defendants knew and understood that Plaintiffs were performing those activities and services and they accepted Plaintiffs' performance of them without participating in or assisting with them.

212.    Plaintiffs reasonably expected to be compensated for their efforts.

213.    Plaintiffs are entitled to an award in their favor in quantum meruit for the reasonable value of the services that they rendered, which amount is the difference between the 3%+ fee that the Defendants should have received, as explained above, and the amount that Defendants actually received.  As shown in the chart above at paragraph 197, that amount approaches $29,145,613.29.  That approximates the amount of damages that should be awarded in this matter.  F&P is entitled to the entire $60,826,481.04.  Mr. Perles,

---

[20] Note that this award does not affect any amounts going to Plaintiffs; this is a re-allocation of attorney fees, not the payment of additional fees or any sums that reduce any amounts to which Plaintiffs are entitled.

Case 1:19-cv-10690   Document 1-1   Filed 11/19/19   Page 51 of 55

Plaintiffs, as an equal partner of F&P, is entitled to 50% of that amount—approximately

$14,572,806.64.

214.    Furthermore, Plaintiffs are entitled to fees in connection with future

recoveries in an amount derived from an award of fees to Defendants of not more than the

rate of 3%+ explained above, after the payment of expenses (not including attorney fees).

C.  COUNT III:  Common Fund

215.    Plaintiffs incorporate all of the preceding paragraphs as though recited here.

216.    The work of Plaintiffs in identifying and seizing the Clearstream Asset,

which was ultimately liquidated and deposited into the QSF, created a common fund for the

benefit of all of the plaintiffs involved in the cases arising out of the Marine Barracks

bombing.

217.    Plaintiffs created a common fund that benefitted all of the plaintiffs and all

of the attorneys involved in the cases arising out of the bombing, including Defendants.

218.    Plaintiffs are therefore entitled to a reasonable fee for their services.

Because Defendants obtained a benefit from the common fund without contributing to it,

they were unjustly enriched and may be assessed attorney fees.

219.    The fees to which Plaintiffs are reasonably entitled as a result of the work

they did in order to secure the common fund is the difference between the fee that the

Defendants should have received (3%, plus some small increase for drafting the cookie-

cutter pleadings) and the amount that they actually received.  As shown in the chart above

at paragraph 197, that amount approaches $60,826,481.04.  That approximates the amount

of damages that should be awarded in this matter.  F&P is entitled to the entire

$29,145,613.29.  Mr. Perles, Plaintiffs, as an equal partner of F&P, is entitled to 50% of

that amount—approximately $14,572,806.64.

220.     Furthermore, Plaintiffs are continuing their efforts to create and expand the common fund by their collection efforts going forward, including with respect to Clearstream II and 650 Fifth Avenue.  For their work regarding such additions to the common fund, Plaintiffs will be entitled to fees in an amount that accounts for fees to Defendants arising out of such future collections of not more than the 3%+ rate described above, calculated after the payment of expenses (not including attorney fees).

D.     COUNT IV:  Indemnification Against Claims by Rothenberg for Additional Fees

221.     Plaintiffs incorporate all of the preceding paragraphs as though recited here.

222.     As outlined above, attorney Allen Rothenberg demands that Plaintiffs pay him, out of Plaintiffs' own pockets, the additional attorney fees that Rothenberg claims he would have received but for the Sharing Agreements, which Sharing Agreements put money into the pockets of Defendants.

223.     In the event that Rothenberg establishes an entitlement to such fees, those fees were received by Defendants in this case, and Defendants must indemnify Plaintiffs with respect to any such entitlement that Rothenberg establishes against Plaintiffs.

E.     COUNT V:  Declaratory Relief

224.     Plaintiffs incorporate all of the preceding paragraphs as though recited here.

225.     As explained above, Plaintiffs continue to search for, and obtain possession of, additional Iranian assets to satisfy the bombing victims' judgments against Iran, including two assets identified as "Clearstream II" and "650 Fifth Avenue."

226.     Defendants have not contributed to the effort to locate and seize additional Iranian assets.  In particular, they did not participate in locating, and have not participated in attempting to secure, Clearstream II or 650 Fifth Avenue.

227.     Plaintiffs therefore seek a declaratory judgment finding that Defendants are liable to Plaintiffs on the same grounds articulated in Counts I – IV in connection with any

future assets Plaintiffs secure for satisfaction of judgments obtained by bombing victims,

should Defendants claim entitlement to attorney fees in connection with such future assets.


Dated: July 8, 2019                    LAW OFFICES OF STEPHEN TURANO

                                       By:      ss//Stephen Turano_____
                                                275 Madison Avenue
                                                New York, NY 10016
                                                (917) 974-1781 (tel)
                                                (212) 208-2981 (fax)

                                                *Counsel for Plaintiffs*


                                       BREGMAN, BERBERT, SCHWARTZ & GILDAY,
                                       LLC

                                       By:      ss//Douglas M. Bregman_____
                                                Douglas M. Bregman
                                                Geoffrey T. Hervey
                                                7315 Wisconsin Avenue
                                                Suite 800 West
                                                Bethesda, Maryland 20814
                                                (301) 656-2707 – telephone
                                                (301) 961-6525 – facsimile
                                                Email: dbregman@bregmanlaw.com
                                                Email: ghervey@bregmanlaw.com

                                                *Counsel for Plaintiffs*


                                       KAISERDILLON, PLLC

                                       By:      ss//Matt Kaiser_____
                                                Matt Kaiser
                                                Christopher C. Muha
                                                1099 14th Street, N.W.
                                                8th Floor West
                                                Washington, DC 20005
                                                (202) 640-2850 – telephone
                                                (202) 280-1034 – facsimile
                                                Email: mkaiser@kaiserdillon.com
                                                Email: cmuha@kaiserdillon.com

                                                *Counsel for Plaintiffs*

Case 1:19-cv-10690 Document 1-1 Filed 11/19/19 Page 54 of 55

## **VERIFICATION**

I STEVEN R. PERLES, swear and affirm, on personal knowledge and under the penalty of perjury, that the contents of the foregoing Verified Complaint Demand are true and correct.


_____                    7/8/19
Steven R. Perles                                    _____
                                                    Date

Case 1:19-cv-10690   Document 1-1   Filed 11/19/19   Page 55 of 55